The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman and the briefs and oral arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior holding. Accordingly, the Full Commission affirms the decision of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 23 July 1998 as:
 STIPULATIONS
1. On 22 May 1997 plaintiff was an employee of the above named employer within the meaning of the Workers Compensation Act, and the parties were bound by and subject to the North Carolina Workers Compensation Act.
2. On such date, the employer was insured by USFG Insurance Company.
3. The average weekly wage will be determined by a Wage Form 22 provided by defendant-employer.
In addition, the parties stipulated into evidence seventy pages of documents including Industrial Commission forms, discovery responses, a transcript of a recorded statement and medical reports. A Pre-Trial Agreement dated 23 July 1998 is incorporated herein by reference.
 ***********
Based upon the entire evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff, who is fifty-six years old and who has a tenth grade education, began working for defendant-employer in September 1994 as a mechanic. His job duties included working on heavy equipment, lawn mowers and any other equipment owned and used by the company. Plaintiff worked considerable overtime hours and, at the time in question, was earning an average weekly wage of $1,342.55.
2. On 22 May 1997 plaintiff was instructed to re-deck a carryall trailer, which was a flat bed trailer used to haul equipment. The trailer had large boards, which were approximately eighteen feet long and weighed approximately one hundred and fifty pounds. It was these boards which plaintiff had to replace. Prior to 22 May 1997, plaintiff had never performed the task of re-decking the trailer. Plaintiff performed these tasks, which were not part of his normal work routine, without the assistance of a co-worker, which meant that he performed these tasks in an unusual manner as well. Additionally, plaintiffs work of maneuvering the boards on and off the trailer was difficult and awkward due to the length of the boards. While performing these duties, plaintiff injured his shoulder, experiencing the onset of pain.
3. The incident which occurred on 22 May 1997 and which resulted in the injury too plaintiffs shoulder constituted an injury by accident arising out of and in the course of his employment with defendant-employer.
4. Plaintiff continued working the remainder of the day on 22 May 1997 despite the pain in his shoulder. Before leaving, plaintiff advised his supervisor, Mr. Bennie Medlin, that his shoulder was bothering him. Plaintiff worked two more days that week, through Saturday, but only worked two hours on Tuesday 27 May 1997 before advising Mr. Medlin that he was leaving to go to the doctor. Mr. Medlin did not inquire about the reason and plaintiff did not tell him that the doctors visit was related to an incident at work because the company had an incentive program which provided bonuses to employees after they had worked certain number of hours without an injury. Plaintiff was close to the number of hours he needed for a $500.00 bonus, so he preferred to pay the co-payment for the doctors appointment since he anticipated that the problem would not be significant.
5. Dr. Moore, plaintiffs family doctor, saw him on 27 May 1997 and opined that plaintiff had strained his shoulder and was experiencing tendinitis of the bicep tendon. The doctor kept plaintiff out of work in order to rest the shoulder. Plaintiff continued to experience persistent symptoms so on 10 June 1997 the shoulder was injected with a cortisone solution and he was given steroidal anti-inflammatory medication. Plaintiff subsequently developed some pain at the elbow so Dr. Moore placed him in a sling. Since the shoulder symptoms did not improve, plaintiff was sent for an ultrasound and then was referred to Dr. Krakauer, an orthopedic and hand surgeon.
6. Dr. Krakauer first examined plaintiff on 22 July 1997. Plaintiffs complaints were confined to the shoulder area and, in Dr. Krakauers opinion, his symptoms were likely due to rotator cuff tendinitis. The doctor injected plaintiffs shoulder and advised him to continue with the medications and exercises previously recommended. The injection gave plaintiff relief for several days, but on 29 July 1997 he returned to the doctor in considerable discomfort. Dr. Krakauer ordered an MRI which revealed findings consistent with an impingement syndrome of the shoulder. Consequently Dr. Krakauer referred plaintiff to Dr. Kobs, the shoulder specialist at the office.
7. Dr. Kobs saw plaintiff on 19 August 1997 and reviewed the MRI. In view of the history of relief from the cortisone injections and the strongly positive impingement testing, it was clear that plaintiff was experiencing symptoms from impingement of the rotator cuff in his right shoulder. Since plaintiffs condition had not improved with conservative treatment, Dr. Kobs recommended arthroscopic surgery. On 24 September 1997, Dr. Kobs performed surgery to decompress the subacromial space in the shoulder. The doctor then followed plaintiffs recovery.
8. On 28 October 1997 plaintiff advised Dr. Kobs that he was experiencing some mild sensory changes in the outer portion of his right arm and that he had been seeing a chiropractor for adjustments. With these new complaints, Dr. Kobs ordered x-rays of plaintiffs cervical spine which revealed moderate to significant degenerative disc disease. Consequently, the order for physical therapy to the shoulder was modified to also include treatment for a cervical spine condition. Dr. Kobs subsequently referred plaintiff to Dr. Albright, the offices spine specialist, for evaluation.
9. Plaintiff saw Dr. Albright on 24 November 1997 and told the doctor he had been having neck pain since his injury in May, which was not true. In fact, plaintiff had not had neck pain until October. After conducting an examination and reviewing the x-rays, Dr. Albright was of the impression that plaintiff had a cervical radiculopathy, so he was sent for a myelogram/CT scan. The tests revealed spinal stenosis at C6-7, which was consistent with his symptoms. Dr. Albright was of the impression that surgery would be advisable, and on 10 December 1997 he operated to decompress and fuse the C6-7 interspace.
10. Following the surgery, plaintiff continued to complain of arm pain and by 27 January 1998 the pain had become severe. Plaintiff was also showing signs of depression, so Dr. Albright prescribed an anti-depressant for him. When plaintiff next returned on 24 February 1998, the pain in his arm was continuing. Dr. Albright ordered a myelogram/CT scan to determine if there was a problem causing the arm pain which could be corrected by another operation. The myelogram was performed 25 February 1998 and did not show any evidence of nerve root compression to explain the symptoms. However, during the night after the myelogram, plaintiff began acting strangely. Ultimately, he became delirious so his wife took him to the emergency room and called Dr. Albright. Dr. Albright examined him at the hospital and called in a neurologist, Dr. Konanc.
11. Plaintiff was seriously ill and was admitted to the hospital. Testing indicated that he was suffering from meningitis, but the treating physicians were not able to determine whether the condition was bacterial, viral or chemical in origin. Regardless of the offending agent, the meningitis did appear to be causally related to the myelogram procedure plaintiff had undergone. Plaintiffs condition improved with treatment and he was ultimately discharged from the hospital. However, when Dr. Moore saw him on 18 March 1998, plaintiff was still disheveled, agitated and rambling, and subsequent testing revealed that his sedimentation rate was significantly elevated. His condition continued to improve but Dr. Moore ordered an MRI of his head at the next follow-up appointment on 24 March 1998. Apparently the test was not performed and plaintiff did not return to Dr. Moore at that time.
12. When plaintiff next saw Dr. Albright on 26 March 1998, his symptoms of cervical radiculopathy were completely gone, which was a surprising development. However, he complained of generalized aches and pains. Dr. Konanc, who saw him on 1 April 1998, was of the opinion that the current symptoms were due to resolving meningeal irritation and he prescribed medication to address the problem. Both doctors continued to follow plaintiffs recovery and recommended that he be evaluated by a psychiatrist regarding his depression and attention difficulties and by a rheumatologist for his complaints of joint pain. Apparently in September 1998 he did see a rheumatologist, Dr. Sinclair, who diagnosed him with left rotator cuff tendinitis but who found no evidence of an underlying arthritic condition. Dr. Sinclair was of the impression that plaintiff might have myofascical pain syndrome but that he did not have fibromyalgia.
13. Plaintiff continued to complain of aches and pains. After discontinuing one of plaintiffs medications, he developed recurrent headaches, low back and leg pain. Consequently he returned to Dr. Konanc, who renewed the prescription. In April 1999 when he returned, plaintiff was still complaining of pain in his legs. At that time Dr. Konanc did not know whether the leg pain was related to the meningitis he had suffered from the previous year.
14. Except for helping his son with the sons construction business, plaintiff did not return to work after 27 May 1997. Defendant-employer terminated his employment in October 1997 because his physicians would not complete certain forms required by the company. At no time prior to his termination did the company offer him light work. In fact, the company insisted that he be released to full duty work before they would allow him to return to work.
15. On 22 May 1997 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The fact that he had to lift and maneuver one hundred and fifty-pound boards onto and off of a trailer without assistance constituted an unusual occurrence which interrupted his regular work routine. He had never before performed this task.
16. As a result of the injury by accident on 22 May 1997, plaintiff injured his right shoulder such that he developed an impingement syndrome and ultimately required surgery to the shoulder joint.
17. The radicular symptoms which plaintiff developed in October 1997 and the cervical spine condition for which he was subsequently treated were not a proximate result of his injury at work. Before October 1997 his symptoms were specific for the impingement syndrome of the shoulder and none of his treating physicians, when presented with the correct facts and the medical reports, were of the opinion that the neck problem was causally related to the accident.
18. The meningitis plaintiff developed in February 1998 was also not a result of the accident. Rather, it arose from diagnostic tests performed for the unrelated cervical spine condition.
19. Plaintiff was unable to work in his regular job for defendant-employer as a result of his shoulder injury during the period between 27 May 1997 and 18 November 1997 when he was being treated for his right shoulder injury, and defendant-employer did not offer work to him which was suitable to his capacity on the occasions during the healing period when he was capable of performing light work. As of 18 November 1997, he was still not capable of performing the heavy lifting required by his regular job due to persistent symptoms in the shoulder. However, his cervical spine condition had become more of a factor in his total disability by that date. The cervical spine condition subsequently became increasingly more significant regarding his inability to work while his right shoulder condition continued to heal and become less of a factor.
20. Dr. Kobs last treated plaintiff for his shoulder on 18 November 1997. Plaintiff had not reached maximum medical improvement as of that date and was supposed to return to Dr. Kobs in two to three months when Dr. Kobs anticipated that he would reach maximum medical improvement. In view of the health problems plaintiff developed during the next several months, there was certainly reason for him not to return to Dr. Kobs at that time. However, he did not go back to see the doctor at any time before the date of hearing. The medical records from his other treating physicians revealed minimal problems with the right shoulder on the few occasions when that shoulder was mentioned. In fact, his left shoulder became a problem by late in the summer of 1998, and that condition was also unrelated to his May 1997 injury at work.
21. Plaintiff reached maximum medical improvement with respect to this injury by accident and his right shoulder condition by 18 February 1998. He has proven disability through that date in that limitations from the shoulder problem prevented him from performing the heavy work duties of his job as a mechanic for defendant-employer. However, the medical evidence did not establish an ongoing disability related to his shoulder condition after that date. Rather, he was unable to work after 18 February 1998 due to his cervical spine condition and meningitis, which conditions were totally incapacitating. However, those conditions were not a proximate result of his injury at work but developed subsequently to and independently of the injury. In view of the lack of medical evidence establishing ongoing disability due to the right shoulder problem after he reached maximum medical improvement on 18 February 1998, plaintiff did not prove that he remained unable to earn wages in the same amount as his pre-injury earnings due to the injury by accident giving rise to this claim. Since plaintiff had not returned to Dr. Kobs for a final evaluation, he had not been rated for permanent partial impairment. Consequently, no finding is made regarding that issue.
22. Defendants raised a notice issue for the first time in the contentions submitted in this case. The issue was not raised in the Form 33R nor was it listed as an issue in the Pre-Trial Agreement. Consequently, it was not raised on a timely basis and no findings are made regarding the issue.
23. On 18 January 2000, the Summit County Support Enforcement Agency of Akron, Ohio, filed a notice that plaintiff was under court order to pay $275.00 per month in child support to that agency. This notice was forwarded to the North Carolina Industrial Commission and is made part of the record of evidence.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 22 May 1997 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. 97-2 (6).
2. Plaintiff had the burden of proving the existence and degree of his disability for all periods up through the date of hearing.Hilliard v. Apex Cabinet Company, 305 N.C. 593 (1982). As the result of his injury by accident on 22 May 1997, plaintiff is entitled to temporary total disability compensation at the rate of $512.00 per week for thirty-eight and 1/7th weeks. G.S. 97-29. Plaintiffs entitlement to this compensation is subject to his legal obligation to pay child support in the amount of $275.00 per month to the Summit County Support Enforcement Agency of Akron, Ohio.
3. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. G.S. 97-2(19); G.S. 97-25; G.S. 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff at the rate of $512.00 per week for thirty-eight and 1/7th weeks for his temporary total disability. This compensation has accrued and shall be paid in a lump sum subject to the attorneys fee hereinafter approved. This compensation is also subject to plaintiffs legal obligation to pay child support in the amount of $275.00 per month to the Summit County Support Enforcement Agency of Akron, Ohio.
2. Defendants shall deduct from the amount of accrued compensation due plaintiff the appropriate amounts which shall then be forwarded to the Summit County Support Enforcement Agency of Akron, Ohio at P.O. Box. 3672, Akron, Ohio 44309-3672.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
4. An attorneys fee in the amount of twenty-five percent of the compensation awarded herein, prior to the deduction of amounts related to plaintiffs support obligations in Ohio, is hereby approved for plaintiffs counsel, which fee shall be deducted from the aforesaid award and paid directly to plaintiffs counsel.
5. Defendants shall pay the costs.
IT IS FURTHERMORE ORDERED:
Defendants shall provide a final evaluation of plaintiff by Dr. Kobs for a permanent partial disability rating.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
S/_____________ THOMAS J. BOLCH COMMISSIONER